So Ordered.

Dated: March 20, 2023



_____
Rachel M. Blise
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

In re:                                                     Case No. 22-20533-rmb
Ricky R. Berryhill &
Keri Larsen-Berryhill                                      Chapter 13
                Debtors.

El'Za Watson,
                Plaintiff,
v.                                                         Adversary No. 22-02043-rmb

Keri Larsen-Berryhill,
                Defendant.

## DECISION AND ORDER

     El'Za Watson purchased a house from debtor Keri Larsen-Berryhill in 2018. Watson alleges that Larsen-Berryhill misrepresented the condition of the house by failing to disclose certain defects before the sale. Watson claims that the resulting debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) because the debt is for money or property obtained by a false representation. Larsen-Berryhill denies that a debt exists and argues that any debt she owes to Watson is subject to discharge.

     The Court held a one-day trial on the questions of liability and dischargeability on November 7, 2022. The parties submitted post-trial briefs, and the Court took the matter under advisement. Based on the evidence presented at trial and the parties' arguments, the Court concludes that Larsen-Berryhill does not owe a non-dischargeable debt to Watson.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and the order of reference from the district court pursuant to 28 U.S.C. § 157(a). See Order of Reference (E.D. Wis. July 10, 1984) (available at www.wied.uscourts.gov/gen-orders/bankruptcy-matters) (last accessed March 20, 2023). This is a core proceeding under 28 U.S.C. §157(b)(2)(I). The parties did not include in their pleadings statements as to whether they consent to the Court entering final judgment on state law claims. *See* Fed. R. Bankr. P. 7008, 7012; Local Rule 7008, 7012. At the final pre-trial conference, the parties' counsel expressly consented on the record to this Court entering final judgment. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

This case involves Larsen-Berryhill's sale of a house on Park Avenue in Racine, Wisconsin to Watson in 2018. The primary question is whether Larsen-Berryhill misrepresented the condition of the house by failing to disclose defects related to water intrusion, the roof, and animal infestation.

### *Larsen-Berryhill's Purchase and Ownership of the House*

Larsen-Berryhill purchased the house, which was built circa 1922, following a foreclosure in 2012. She bought the house from the foreclosing lender "as-is," without obtaining an inspection and without speaking to any previous owners or occupants. She occupied the house as her primary residence for approximately six years until she sold it to Watson in 2018. Larsen-Berryhill testified that she did not experience issues related to water intrusion, the roof, or animal infestation while she lived in the house.

Larsen-Berryhill testified that she had no problems with water intrusion while she owned the house. She did not notice any water spots or damage on any of the drywalled ceilings on the

interior of the house. She did not notice any damage or water spots on the underside of the roof decking when she occasionally entered the attic to store or retrieve items. When it rained, she did not see any leaks in any portion of the house or garage. Larsen-Berryhill testified that she did notice condensation on the inside of certain windows, but she said she had no reason to believe that the water she saw was leaking in from the outside. She was aware that the windows were old and drafty, and she addressed that problem by taping plastic to the windows in the winter months.

As to the roof, Larsen-Berryhill testified that she had no experience with home repairs in general or with roof issues in particular. She did not go on the roof during the time that she owned the house, and she never contracted for any repairs to the roof. According to Larsen-Berryhill, any repairs or other work performed on the roof were done before she purchased the house. She also did not obtain any sort of inspection of the roof before or after she purchased the house. She was aware that a branch of a tree in her neighbor's yard began touching the roof of the house during her ownership because she heard a scraping noise. Larsen-Berryhill disclosed this issue problem before the sale, but she testified that she had no reason to believe the branch had damaged the roof.

Finally, Larsen-Berryhill testified that she never saw any animals in the house and never noticed animal droppings or evidence of animal presence in the house or attic. She owned both a cat and a dog while she lived in the house, and she did not notice either of them engaging in hunting behaviors. She was familiar with such behaviors because the cat had hunted mice in a prior residence before she moved into the house. Larsen-Berryhill did use two ultrasonic animal deterrent devices while she lived in the house. She testified that the devices were installed as a precaution and not because she believed any animals had entered the house. She testified to using such devices in her residence both before and after she lived in the house.

*Disclosures and Sale to Watson*

Larsen-Berryhill listed the house for sale in 2018. On September 2, 2018, she signed a Real Estate Condition Report ("RECR") as required under Wisconsin law. The RECR is structured as a series of yes-or-no questions to the seller and asks whether the seller is aware of certain defects. It defines the term "aware" as "hav[ing] notice or knowledge." It defines the term "defect" as "a condition that would have a significant adverse effect on the value of the property; that would significantly impair the health or safety of future occupants of the property; or that if not repaired, removed, or replaced would significantly shorten or adversely affect the expected normal life of the premises." Watson's claim is based on Larsen-Berryhill answering "no" to the following questions:

> Question B1: "Are you aware of defects in the roof?"
>
> Question B11: "Are you aware of basement, window, or plumbing leaks, overflow from sinks, bathtubs, or sewers, or other ongoing water or moisture intrusions or conditions?"
>
> Question C5: "Are you aware of current or previous termite, powder post beetle, or carpenter ant infestations or defects caused by animal, reptile, or insect infestations?"

On September 15, 2018, Watson submitted an offer to purchase the house for $154,000, contingent on a satisfactory inspection and his ability to obtain financing. The same day, he countersigned the RECR, acknowledging his receipt of the disclosures in the document.[1] Watson did not see the house in person before submitting the offer.

Watson retained home inspector Joe Haluska, who inspected the house on September 25, 2018. Watson was present for some of the inspection, and he expressed several concerns to Haluska during the inspection. He noted an exposed wire in the basement and what appeared to

---

[1] At trial, Watson's testimony suggested that he may not have fully understood the terms he agreed to in the various offers and amendments he exchanged with Larsen-Berryhill before closing. Even so, there is no dispute as to the authenticity or content of the sale documents and no dispute that Watson agreed to those documents' terms.

Case 22-02043-rmb    Doc 39    Entered 03/20/23 16:37:35    Page 4 of 27

be flaws or water issues in the brick in the basement. Watson did not note any other visible water damage, any issues with the roof, or any evidence of animal infestation. He testified that he had noticed a strong perfume smell and the ultrasonic animal deterrent devices, but he never asked about the smell or the devices.

Haluska prepared a report detailing his inspection of the house. In his report, Haluska identified problems with the electrical wiring, the fireplace, and a sink in one of the bathrooms. He recommended painting the trim and repairing or replacing the house's windows, some of which were caulked or taped shut. Haluska's report does not mention any signs of water intrusion on the interior of the house or garage or any signs of animal infestation.

According to the report, Haluska inspected the roof from the ground both with and without binoculars, from the top of a ladder, and from the interior of a skylight. He described a flat, rubber roof that serves as the floor of a second-floor deck as being in poor condition, and he said that repair or replacement of that portion of the roof was likely necessary to prevent water intrusion. Haluska described the shingled portion of the roof, which covers the vast majority of the house, as being in "decent shape" for its age, and he opined that it would not need to be replaced for ten or more years. Watson testified that he received a copy of the inspection report before the sale closed, but that he did not read it until after the closing.

After the inspection, Watson submitted several amendments to the offer to purchase, all of which were accepted by Larsen-Berryhill. Watson testified that he did not remember signing any of the amendments and had no knowledge regarding their terms or purpose. The Court therefore relies on the documents themselves and Larsen-Berryhill's testimony regarding the negotiations. On September 30, 2018, Watson submitted an amendment that extended the deadline for the inspection contingency and allowed a foundation specialist to inspect the basement, though a second inspection was never performed. On October 4, 2018, Watson

submitted another amendment that reduced the purchase price by $20,000 to $134,900. Larsen-Berryhill testified that the price was reduced to provide compensation for the condition of the flat, rubber roof and because Watson could not obtain a VA loan due to the condition of the paint on the house's windows and trim. The amendment also required Larsen-Berryhill to perform certain maintenance in exchange for a waiver of the home inspection contingency, including repairing the bathroom sink identified in the inspection report, repairing two doors, and cleaning the gutters. Watson submitted a final amendment on October 25, 2018, which changed the financing contingency from a VA loan to a conventional loan and extended the time for Watson to obtain financing. The sale closed in November 2018. Watson did not exercise his contractual right to conduct a pre-closing walkthrough.

### Watson's Discovery of Alleged Defects

Watson testified that he discovered several defects in the house not long after the sale.

Water Intrusion: Watson testified to four instances of water intrusion after he purchased the house. First, during a heavy rainstorm that occurred in the first few weeks after the purchase, Watson was concerned about water coming into the house. He searched the house for signs of leaks, and he saw drops of water running down the face of the chimney in the attic. He did not notice any other window or roof leaks at that time.

Second, soon after seeing the chimney leak, Watson noticed water coming into the attic near the "apex" of the roof. He lined the attic floor with trash bags and containers to catch the water and to prevent damage to the ceiling above a second-floor hallway near the primary bedroom. It is unclear from Watson's testimony whether the leak in fact caused water damage to that ceiling or whether any water damage was visible from that hallway.

Third, Watson later discovered a leak over the garage. The water damaged the garage ceiling, as well as the vehicles parked in the garage. Watson hired a contractor to remove the

6

ceiling and patch the leak so the water would not cause further damage. Watson did not testify that he noticed any water damage in the garage before he discovered the leak. Aside from some dirt on the tile walls, there was no evidence at trial regarding the condition of the garage when Larsen-Berryhill signed the RECR.

Fourth, Watson noticed that water was entering a window in the first-floor sunroom in the late winter or early spring after the purchase. Upon inspecting the window, Watson discovered that the wood frame had rotted and there was a hole in the window. He patched the window using a block of wood to keep out the wind and water.

At trial, Watson presented other evidence of prior water intrusion that was identified by his expert. Watson did not testify to seeing water actually intruding from these areas, which are discussed below.

Roof. In October 2019, Watson hired an engineering firm to evaluate the house. Boyd Coleman of StructRite, Inc. visited the property twice and prepared an extensive report. Coleman identified multiple sites where the home's waterproofing was either improperly installed or appeared to have been hastily repaired after it degraded, sometimes with sub-standard materials. Specifically, Coleman identified several places where the house showed water damage or where the roof's condition created significant risk of water damage in the future. Watson's claims focus on the roof defects that Coleman identified.

First, there was deteriorated flashing at the joints between the shingled roofs over the garage and the front porch and the adjacent second-story exterior walls. Coleman noted that some of those areas had been patched with a form of caulk, and he testified that caulk is not a substitute for proper flashing. He opined that the lack of appropriate flashing was a defect in the roof because the lack of proper flashing meant that water could penetrate in the joints. The water would damage the roof decking and eventually come into the house, damaging its interior.

Second, Coleman testified that the flashing around the chimney in the area where the chimney meets the roof was not properly installed. The flashing did not direct water away from the chimney and onto the roof, and it was improperly adhered with a material he referred to as "black jack." He opined that the improper installation would cause water to penetrate behind the flashing and down the chimney into the attic and eventually into the house.

Third, Coleman testified that improper materials had been installed around at least one of the second-floor dormer windows. Proper materials would have acted as flashing and allowed water to run away from the window and down the shingled roof. The improper material was pulling away and would eventually cause water to intrude in the house.

Fourth, Coleman testified that several areas of the roof did not have a "drip edge" between the shingled roof and the gutters. The drip edge would allow water to flow off shingles and into the gutters. Without the drip edge, water could flow behind the gutters and seep under the shingles. Coleman identified several areas where shingles were pulling away from the roof decking and where the roof decking underneath was deteriorating.

Fifth, Coleman identified several cracks in the brick on the front porch. He opined that the cracks were likely caused by defects in the roof that allowed water to flow down the side of the house rather than into the gutters. He opined that the water flow caused the brick to deteriorate faster than it otherwise would have.

Coleman opined that the roof issues had been present for at least five years. He explained that the sloppy patches, caulked seams, and lack of proper flashing showed that someone had attempted to quickly fix a water intrusion problem and had not gone back to properly repair the areas. Coleman testified that the condition of the caulk and patches suggested that they were applied at least several years prior to his inspection, but he could not determine

the exact date from his inspection. He agreed that the caulk and patches could have been installed before Larsen-Berryhill purchased the house in 2012.

Coleman agreed that someone not familiar with roofing requirements may not recognize the issues he identified as defects in the roof and windows. He also agreed that most of the issues were not visible from the ground and that an unskilled person may not recognize some of cracks and other signs on the exterior of the house as water damage.

Coleman also noted issues with water intrusion into the house. He testified that there were cracks around some of the windows on the exterior windowsills and brick façade that were allowing water to penetrate where it should not have been. Coleman testified that he could see water spots or evidence of water penetration in several places on the interior of the house: 1) The deteriorated window in the sunroom; 2) water spots on the attic ceiling; 3) peeling paint and damage to the brick in the basement; 4) damage to the ceiling in the garage; and 5) dirt on tiled garage walls that was caused by water running down the walls.

<u>Animal Infestation</u>. Watson testified that he noticed a perfume smell when he toured the house during the inspection. When he returned after the closing, the perfume smell had faded and he could smell signs of animal infestation. He saw mice, a squirrel, and an unidentified animal that Watson thinks may have been a raccoon. Watson discovered one area where the fascia was missing just outside of a second-floor window. He surmised that animals were entering through the hole, and he covered the hole with a brick by leaning out the window. A roofing contractor that he hired to remedy some of the roof leaks later rigged a sheet of metal over the hole. Watson said he still frequently sees animal droppings and that there is an unpleasant smell inside the house.

9

### *Watson's State Court Lawsuit*

Watson filed a complaint against Larsen-Berryhill in Racine, Wisconsin County Circuit Court on September 24, 2020.[2]  The complaint included four causes of action:  breach of contract, common-law intentional misrepresentation, civil theft-by-fraud under Wis. Stat. §§ 895.446, 943.20(1)(d), and false advertising under Wis. Stat. § 100.18.  Larsen-Berryhill and her husband filed a chapter 13 petition on February 14, 2022, which stayed the litigation in state court.  The state court did not enter any findings or decisions regarding Larsen-Berryhill's liability on Watson's claims before the bankruptcy was filed.  Watson filed this adversary proceeding seeking a determination that Larsen-Berryhill owes him a debt that is not dischargeable under 11 U.S.C. § 523(a)(2)(A).

### ANALYSIS

A non-dischargeability claim under 11 U.S.C. § 523(a)(2)(A) requires that the plaintiff prove the debtor owes an underlying debt.  The evidence at trial did not establish that Larsen-Berryhill owes a debt to Watson under non-bankruptcy law, which defeats his nondischargeability claim.

### I.  The Existence of an Underlying Debt is a Threshold to Non-Dischargeability.

Watson asserts that he is not required to establish Larsen-Berryhill's liability under state law as a prerequisite to the Court determining that the debt owed to him is not dischargeable.  Larsen-Berryhill disagrees, arguing that Watson must first establish liability under state law before the Court can determine whether the debt is not dischargeable.  The Court agrees with

---

[2] The parties did not introduce evidence related to the state court lawsuit at trial, but Larsen-Berryhill attached Watson's state-court complaint to her post-trial brief and referred to the complaint throughout her brief.  In his reply brief, Watson did not object to the Court's consideration of the contents of the document.  The Court therefore takes judicial notice of the fact that the document was filed and the claims asserted therein but does not take judicial notice of the facts alleged.  *In re Peterson*, 604 B.R. 751, 756 (Bankr. E.D. Wis. 2019), *aff'd sub nom. Peterson v. Cuene*, 623 B.R. 758 (E.D. Wis. 2021) ("The Court may take judicial notice of state court dockets under Federal Rule of Evidence 201.") (citing *Guaranty Bank v. Chubb Corp.*, 538 F.3d 587, 591 (7th Cir. 2008)).

Larsen-Berryhill. There must be an underlying debt for the Court to except that debt from discharge.

The Bankruptcy Code excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . a false representation[.]" 11 U.S.C. § 523(a)(2)(A). The term "debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). The term "liability" is not defined in the Bankruptcy Code, but dictionaries generally define the term as the state of being responsible or obligated by law. *See, e.g.*, *Liability*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/liability (last visited March 20, 2023) ("something for which one is liable; especially: pecuniary obligation: debt"); *Liability*, Black's Law Dictionary (11th ed. 2019) ("The quality, state, or condition of being legally obligated or accountable[.]"). A "claim" is simply a "right to payment." 11 U.S.C. § 101(5).

Applying those definitions to § 523(a)(2)(A), when a debtor is obligated by law to pay a creditor, that obligation is not dischargeable when the obligation arose due to a false representation. The debtor must first be obligated by law to pay a creditor for that obligation to be excepted from discharge.

The court in *S & L Enters. I, LLC v. Eisaman (In re Eisaman)*, 387 B.R. 219 (Bankr. N.D. Ind. 2008), explained:

> The provisions of § 523(a) do not make a debtor liable to a creditor. They merely determine whether an existing liability is a dischargeable one. That liability – the debt – is determined by non-bankruptcy law. Thus, the first step in determining whether or not a particular debt is dischargeable is to make certain that there is, indeed, a debt owing by the debtor to the creditor. Without such an obligation, there is no debt which could be excepted from the scope of the debtors' discharge.

*Id.* at 224; *see also In re Osula*, 519 B.R. 361, 377 (Bankr. D. Mass. 2014) ("A plaintiff is required to establish both that he has a valid claim against a debtor *and* that the claim should not

be discharged in bankruptcy.") (emphasis in original). Thus, there are two steps in adjudicating a non-dischargeability claim under § 523(a)(2)(A). The first step is determining whether a debtor is obligated by law to pay a creditor. The second step is determining whether the obligation arose due to a false representation.

Watson must therefore prove both that a debt exists, and that the debt is not dischargeable. Watson skips straight to the second step. He focuses solely on whether the debt is not dischargeable, and he argues that he need not prove that Larsen-Berryhill is liable under state law. He relies primarily on *Holton v. Zaidel (In re Zaidel)*, 553 B.R. 655 (Bank. E.D. Wis. 2016). In that case, the creditor alleged that the debtors misrepresented the condition of a house in connection with a real estate transaction. *Id.* at 662. The court's analysis focused on whether the alleged debt was not dischargeable, and the court did not include any analysis as to the debtor's underlying liability to the creditor. *Id.* at 663-68. The court did not hold that such an analysis is *never* necessary. Rather, the court concluded that the analysis was not necessary in that case. The creditor had not proven that the debt was not dischargeable, and the debtors' liability on the underlying claim would have no impact on the bankruptcy. *Id.* at 658 n.1 ("Because the court finds that the alleged debt is dischargeable, regardless of the amount, it need not determine any remaining issues of state law, such as liability or the amount of damages."). The *Zaidel* court expressly acknowledged the need to determine whether there was underlying liability, but the court decided to forego that determination due to the posture of the case.

Here, the Court cannot skip the liability determination and proceed straight to the non-dischargeability analysis. The *Zaidel* case was a no-asset chapter 7 case. Whether the debtor was liable on the underlying debt for which the creditor sought a non-dischargeability determination would have no effect on the estate or other creditors in the case because no creditors received a distribution. This case is a chapter 13 case. The debtors' chapter 13 plan,

which has not yet been confirmed, proposes to pay unsecured creditors at least $13,773.24. Watson filed a proof of claim in the amount of $50,000. Whether Larsen-Berryhill in fact owes a debt to Watson will have consequences on the estate and other unsecured creditors. If Larsen-Berryhill is liable on the debt, then Watson will receive a distribution as an unsecured creditor even if the debt is dischargeable. Moreover, Larsen-Berryhill filed an objection to Watson's proof of claim in the main case, arguing that she does not owe a debt to Watson and his claim should therefore be disallowed. The Court therefore will need to adjudicate the issue of whether Larsen-Berryhill owes a debt before determining whether that debt is not dischargeable.

Watson is simply wrong that he need not prove that Larsen-Berryhill is liable under non-bankruptcy law.[3] As the *Eisaman* court explained, the non-dischargeability provisions in § 523(a) do not make the debtor liable to the creditor. Watson is required to prove that Larsen-Berryhill owes him a debt that arises from some source other than § 523(a)(2)(A).

## II.    Watson Did Not Prove Larsen-Berryhill is Liable Under State Law.

Watson's theory that he need not prove that Larsen-Berryhill is liable on an underlying debt resulted in post-trial briefing in which Watson did not explain how the trial evidence established that Larsen-Berryhill owes a debt to Watson. The only theory of liability that Watson briefed was false advertising under Wis. Stat. § 100.18, which he raised in his reply brief. Larsen-Berryhill's brief addressed each of the theories of liability that Watson pleaded in state court before Larsen-Berryhill filed for bankruptcy. The Court will therefore review the four

---

[3] Watson's error in analysis is apparent given his argument regarding the applicable standards. He says that the reliance element under § 523(a)(2)(A) is met by "justifiable reliance," rather than "reasonable reliance," which would apply to most Watson's state-law claims. ECF No. 38 at 2. Watson argues that it would make no sense for a court to employ a "more demanding reasonable standard" to determine liability and a "less demanding standard" of justifiable reliance to dischargeability. Under Watson's view, a creditor with a claim under § 523(a)(2)(A) is better off, and his claims easier to prove, when a debtor files bankruptcy. The Court expresses no opinion on whether one standard is more or less demanding than the other. Suffice it to say that Watson's argument proves his error. It simply cannot be that a debtor who files bankruptcy could be liable for a non-dischargeable debt when she may not be liable on the debt absent the bankruptcy.

theories Watson raised in state court. The evidence at trial does not establish that Larsen-Berryhill is liable under any of the theories, mostly for the same reason: Watson did not prove that Larsen-Berryhill knew about the defects he says she did not disclose. For the one defect that Larsen-Berryhill could have known about when she signed the RECR, Watson's claim is barred by his failure to obtain further information after he was put on notice of the defect.

### A.    The Elements of Watson's State Law Claims

Watson's state court complaint against Larsen-Berryhill included four causes of action: breach of contract, common law misrepresentation, statutory theft-by-fraud under Wis. Stat. §§ 895.446 and 943.20(1)(d)[4], and false advertising under Wis. Stat. § 100.18. Three of the four claims must be proven by a preponderance of the evidence, the ordinary burden in Wisconsin civil cases. *See Nommensen v. Am. Cont'l Ins. Co.*, 2001 WI 112, ¶ 16, 246 Wis. 2d 132, 141, 629 N.W.2d 301, 305 ("[T]he appropriate quantum of evidence in an ordinary civil case is 'the greater weight of the credible evidence,'" which equates to preponderance of the evidence); *Malzewski v. Rapkin*, 2006 WI App 183, ¶ 22, 296 Wis. 2d 98, 723 N.W.2d 156 (applying preponderance of the evidence standard to theft by fraud claim). The misrepresentation claim must be proven by "clear, satisfactory, and convincing evidence." *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 52, 262 Wis. 2d 32, 54-55, 662 N.W.2d 652, 663.

Each of Watson's claims is based on Larsen-Berryhill's answers to Questions B1, B11, and C5 of the RECR. The questions asked whether Larsen-Berryhill was aware of certain defects, and she answered that she was not aware. An element of every claim, then, is that Larsen-Berryhill must have had knowledge such that she was, in fact, aware of the defects.

### 1.    Breach of Contract

---

[4] These two statutes, taken together, create one civil cause of action. Section 943.20(1)(d) creates criminal liability for obtaining property by fraud, and section 895.446 creates a civil remedy for individuals harmed by that criminal conduct.

Watson's complaint alleges that Larsen-Berryhill breached the parties' contract by failing to identify conditions affecting the property. ECF No. 37, Ex. A at ¶ 9. Wisconsin courts have construed similar allegations of breach of contract as breach of warranty claims for failure to disclose conditions in the RECR. *See Sanders v. Hertel*, 2019 WI App 26, ¶¶ 10-12, 387 Wis. 2d 685, 928 N.W.2d 803 (per curiam) (unpublished) ("[D]espite the fact that the [plaintiff homebuyers] do not specifically plead a claim for breach of warranty . . . they do not refer to any other clause in any contract in support of their breach of contract claim, and are, therefore, asserting a claim for breach of contract warranty[.]"). The elements of a breach of warranty claim under Wisconsin law are (1) an affirmation of fact, (2) inducement to the buyer and (3) reasonable reliance by the buyer. *Malzewski*, 2006 WI App 183, ¶ 14.

The element relevant here is the affirmation of fact. To prove that Larsen-Berryhill made an affirmation of fact that was untrue, Watson must prove that Larsen-Berryhill was aware of defects so that her answers to the questions on the RECR were untrue.

### 2. Intentional Misrepresentation

Watson alleges that Larsen-Berryhill misrepresented the condition of the property by falsely answering Questions B1, B11, and C5 on the RECR and by omitting information regarding known material defects and adverse conditions affecting the property. The elements of a common law intentional misrepresentation under Wisconsin law are: "(1) the defendant made a representation of fact; (2) the representation was untrue; (3) the defendant made the representation either knowing that it was untrue, or recklessly not caring whether it was true or false; (4) the defendant made the representation with the intent to deceive the plaintiff in order to induce the plaintiff to act on it to the plaintiff's pecuniary damage; and (5) the plaintiff believed that the representation was true and relied upon it." *Malzewski*, 2006 WI App 183, ¶ 17. For the

third element, Watson must demonstrate that Larsen-Berryhill knew her answers to the RECR questions were untrue.

### 3.    Wis. Stat. §§ 943.20 and 895.446

"The cause of action under Wis. Stat. § 895.446 does not have a set of elements unique from criminal causes because the statutory civil claim is tied to whichever enumerated criminal statute listed in subsection (1) [of Wis. Stat. § 943.20] applies." *Estate of Miller v. Storey,* 2017 WI 99, ¶ 40 n.16, 378 Wis. 2d 358, 903 N.W.2d 759.  Thus, "[t]he elements of criminal theft under Wis. Stat. § 943.20 are exactly the same as the elements of the civil theft claim[.]" *Id.* The elements of a civil claim for theft-by-fraud under Wis. Stat. §§ 943.20(1)(d) and 895.446, are: (1) plaintiff was the owner of property; (2) the defendant made a false representation to the owner; (3) the defendant knew the representation was false; (4) the defendant made the representation with intent to deceive and to defraud the owner; (5) the defendant obtained title to the property of the owner by the false representation; (6) the owner was deceived by the false representation; and (7) the owner was defrauded by the representation.  Wis JI—Criminal 1453A.  Again, Watson must prove that Larsen-Berryhill knew her representations on the RECR were false.

### 4.    Wis. Stat. § 100.18

The elements of a claim under Wis. Stat. § 100.18 are: "(1) the defendant made a representation to the public with the intent to induce an obligation, (2) that the representation was untrue, deceptive or misleading, and (3) that the representation caused the plaintiff a pecuniary loss." *Novell v. Migliaccio*, 2008 WI 44, ¶ 44, 309 Wis. 2d 132, 749 N.W.2d 544 (citing *K&S Tool & Die Corp. v. Perfection Mach. Sales Inc.*, 2007 WI 70, ¶ 19, 301 Wis. 2d 109, 732 N.W.2d 792) (internal quotations and additional citations omitted).  Watson must prove that

Larsen-Berryhill's statements on the RECR were untrue; that is, he must prove that she was aware of the defects she did not disclose.

## B. Larsen-Berryhill's Knowledge

Watson's claims all require that Larsen-Berryhill had knowledge of the water intrusion, roof, or animal infestation problems that he alleges were defects that should have been disclosed on the RECR. There is some dispute whether certain alleged defects were even present when Larsen-Berryhill signed the RECR or by the time of the sale to Watson. But it does not matter for Watson's claims whether the defects were present at the time. What matters is whether Larsen-Berryhill had knowledge of the defects. *See, e.g., Korth v. Hoffman*, 2019 WI App 5, ¶¶ 8-15, 385 Wis. 2d 514, 925 N.W.2d 782 (per curiam) (unpublished) (summarizing evidence and remanding for trial on whether the sellers had knowledge of the defects). The evidence presented at trial does not indicate that Larsen-Berryhill had the requisite knowledge.

### 1. Water intrusion.

Watson argues that Larsen-Berryhill's answer to Question B11 of the RECR, indicating that she did not know of any "source of water intrusion," was false. The evidence at trial demonstrated the following instances of water intrusion:

1. Water leaking down the chimney in the attic;

2. Water leaking into the attic from the "apex of the roof";

3. General water intrusion that caused water spots on the underside of the roof decking in the attic;

4. Water leaking into the garage that caused dirt to run down the walls;

5. Water leaking in through one of the windows in the sunroom;

6. Water leaking into the basement; and

7. Water damage to the exterior of the house, including damaged shingles and roof decking, cracks around some of the windows, and cracks on the front porch.

17

Watson was required to prove that Larsen-Berryhill knew about at least one of these instances of water intrusion for her answer to be false. With the exception of the water in the basement, there is insufficient evidence that Larsen-Berryhill knew about the water intrusion.

Attic. Watson did not prove that Larsen-Berryhill knew about any of the water intrusion in the attic. Watson observed water leaks around the chimney and from the "apex" when he went into the attic while it was raining and the roof was actively leaking. There is no evidence that Larsen-Berryhill ever went into the attic during a rain event so that she would have witnessed the active leaks. And there is no evidence that the attic leaks caused water damage to the finished areas of the house so that Larsen-Berryhill could have known about the leaks in the attic.

Larsen-Berryhill did testify that she stored items in the attic and periodically went to the attic to store or retrieve items, but she never noticed that anything stored in the attic was wet. It is possible that Larsen-Berryhill could have seen the water spots on the roof decking in the attic, but there is no direct evidence of that. Larsen-Berryhill spent little time in the attic, and she has no experience in construction or home improvement. The Court cannot infer that she even examined the ceiling when she went to the attic, much less that she would know she was looking at spots or damage caused by water intrusion.

Garage. Larsen-Berryhill testified that she knew the tile walls in the garage had dirt on them. She said that she did not know the dirt was caused by water dripping down the wall; she thought the walls just needed to be cleaned. She said she never saw water in the garage, and she did not otherwise see water spots or other evidence that water had been present. Other than the dirt on the garage walls, Watson did not present evidence that there was anything in the garage that would have or should have alerted Larsen-Berryhill that water was leaking into the garage.

18

The Court finds that Watson did not prove that Larsen-Berryhill knew about any water intrusion issues in the garage. Larsen-Berryhill did not have the requisite background in water intrusion or home repair or structural issues such that she would have known the dirt on the tile wall in the garage was the result of water running down the wall and not just the sort of dirt that is often present in a garage.

<u>Sunroom Window</u>. Larsen-Berryhill testified that many of the windows were drafty, and she noticed condensation on the interior of some of the windows. She attributed any moisture she saw on the windows to that condensation, and she did not see water leaking into any of the windows. She did notice that the windows were not in good shape from lack of upkeep, but she did not believe that any of the windows were rotted to the point of creating a hole in the windows or the wood frame that would constitute a defect.

Watson purchased the house in November. He testified that in late winter or early spring he began to notice water coming into a window in the sunroom. He discovered that a portion of the wood window was rotted, and he put wood blocking over the window to keep the wind and water out. Coleman noted on page 7 of his report that the water may have run down the house and into the window due to cracks in the windowsill of the second-floor window above.

Watson did not present any evidence regarding the knowledge that Larsen-Berryhill had or should have had about the windows when she signed the RECR. Because Watson did not notice the water coming through the window until several months after the purchase, the Court cannot infer that Larsen-Berryhill saw or knew about any water infiltration without more information regarding the condition of the window at the time of the sale. Moreover, the water intrusion seems to have begun due to the deteriorated wood frame of the window. Watson was put on notice of the deteriorated window because Haluska noted in his inspection report that the condition of the windows in the sunroom was "marginal." As explained below, this notice

means that Watson's reliance on the RECR was unreasonable even if Larsen-Berryhill did have knowledge of water intrusion.

Basement.  Watson did not testify that he noticed any water present in the basement, but he did question the condition of the brick while he toured the house with Haluska.  Coleman identified water-related defects on page 2 of his report.  Coleman opined that the basement walls show signs of water damage, both from below grade water and from drainage issues due to the improper runoff from the defective gutters, roof, downspout, and windows.  The pictures in Coleman's report show that the paint is peeling and there are visible signs of water damage.  The photos on page 28, 29, 31, and 34 of Haluska's inspection report show the same signs of water damage.  The house's laundry facilities were in the basement, so it is likely that Larsen-Berryhill frequently entered and used the basement, though there was no testimony at trial on this point.  It may be that Larsen-Berryhill knew about the water damage in the basement, but the Court need not make any findings regarding her knowledge.  As explained below, assuming Larsen-Berryhill's disclosure in the RECR was false as to the basement condition, Watson did not reasonably rely on the RECR.

Exterior Issues.  Coleman testified regarding several issues related to water damage on the exterior of the house.  He saw damaged shingles and roof decking, cracks around some of the windows and windowsills, and cracks in the front porch, all of which he attributed to water issues.  Larsen-Berryhill testified that she did not notice any of these issues or attribute them to defects related to water intrusion.

The Court finds that Watson did not prove that Larsen-Berryhill had knowledge of the conditions or knew that any of them were related to water intrusion.  Without any knowledge or training regarding structural issues or the signs of water intrusion, it is hard to understand how

Larsen-Berryhill knew that these issues were defects that she was required to disclose on the RECR.

### 2. Defects in the roof

Watson next claims that Larsen-Berryhill's answer to Question B1 on the RECR – "Are you aware of defects in the roof?" – was false. As described above, Coleman identified several issues on the roof. Some of the roofing material was installed incorrectly, the flashing was missing or improperly installed in many areas, and prior patches were done incorrectly and deteriorating. Coleman testified that he identified most of the issues by climbing on the roof and inspecting the areas up close. Larsen-Berryhill testified that she never went on the roof during the six years that she owned the house, and that she had no knowledge regarding proper roofing methods or materials.

The Court finds that Watson did not prove that Larsen-Berryhill had knowledge of the defects in the roof. Coleman agreed that none of the defects was visible from the ground. Rather, one would need a ladder to view the defects. Larsen-Berryhill testified that she only viewed the roof from the ground, and Watson did not present evidence otherwise, so she could not have known about the defects. Indeed, Haluska, who, unlike Larsen-Berryhill, probably has had training and/or experience in spotting roof defects, did not notice any of the defects when he inspected the roof from the ground before the sale.

Watson relies on Coleman's testimony that a series of sub-standard repairs were made to the roof sometime before Watson bought the home. Watson implies that some or all of the repairs were made while Larsen-Berryhill owned the house, but he did not present any evidence on that point. To the contrary, Coleman testified that the patches had been in place for at least several years because they showed signs of degradation, and he agreed that they could have been made more than seven years before his inspection, *i.e.* before Larsen-Berryhill bought the house.

Moreover, even if repairs to the roof *were* made during Larsen-Berryhill's ownership, Watson does not suggest that she performed the repairs herself. There is nothing at all in the record to suggest that Larsen-Berryhill could have or should have known that any repairs performed by others were not sufficient to maintain the roof such that there were defects in the roof she should have disclosed on the RECR.

### 3. Animal infestation

Lastly, Watson claims that Larsen-Berryhill's answer to Question C5 on the RECR was false. That question asked: "Are you aware of current or previous termite, powder post beetle, or carpenter ant infestations or defects caused by animal, reptile, or insect infestations." The evidence at trial focused on whether there were animals in the house at all. However, the question on the RECR suggests that the mere presence of animals may not be a defect. The question asks about infestation of specific insects, suggesting that the presence of those specific insects is a defect. For other animals, reptiles, and insects, the question asks about defects caused by infestation, which suggests that their mere presence itself is not a defect. Nevertheless, because the parties did not argue or brief the question whether the presence of rodents or other animals in the house is a defect, the Court will assume that the presence of wild rodents and animals is a defect that should have been disclosed on the RECR if Larsen-Berryhill had knowledge of their presence.

Watson testified that he began seeing evidence of animals like mice and squirrels in the house shortly after he moved in. He also testified that he discovered a hole in the fascia through which he believed the animals were entering. He claims that the animals must have been entering the house before he purchased it.

Larsen-Berryhill testified that she never saw any animals or signs of infestation. Watson attempts to overcome this testimony by pointing to two facts. First, Larsen-Berryhill used

ultrasonic "black boxes" in the house, which are devices used to deter animals. Second, Watson said that there was a perfume smell in the house when he attended the inspection with Haluska and when he first entered the house after the purchase. He said that as the perfume smell faded, the house began to smell of animals. Watson argues that Larsen-Berryhill used air fresheners to mask the smell from animals she knew were present.

Neither fact supports Watson's argument that Larsen-Berryhill had knowledge of any animal infestation. Larsen-Berryhill testified that she had experienced animal infestation in a prior residence before she moved into the house. She relied on the ultrasonic devices to combat that infestation and decided to use the devices in the house after moving in to prevent a similar experience. She continued to use the devices in her residence after she moved out of the house. Watson presented no evidence to undermine this testimony, and the Court finds Larsen-Berryhill's testimony on this point to be credible. The Court therefore cannot infer from the presence of those devices that Larsen-Berryhill was using them to deter animals that she knew had entered the house. With respect to the perfume smell, Watson did not present any evidence of what caused the scent that he says disguised the smell of animals. Without that evidence, the Court cannot determine whether Larsen-Berryhill purposefully used air fresheners or essential oils to mask an unpleasant odor, or whether the scent that Watson observed resulted from Larsen-Berryhill's normal activities and habits, such the use of personal care products, laundry products, or cleaning products.

In his post-trial brief, Watson argues that "[t]he metal plate used to block one entry point for animals through the roof depicted on Page 4 of Mr. Coleman's report must have been installed during Ms. Larsen-Berryhill's ownership because Mr. Watson testified that it was not installed during his ownership." ECF No. 36 at 5. To the contrary, Watson specifically testified that he discovered a hole in the fascia, that he installed rudimentary blocking to cover the hole,

and that a roofing contractor later installed the metal sheet. The Court therefore does not credit Watson's assertion in his brief.

* * * * *

With the exception of the basement issue discussed below, the Court finds that Larsen-Berryhill did not know about any of the defects discussed at trial. Watson concedes in his post-trial brief that his evidence is "circumstantial," but he suggests that the Court can infer Larsen-Berryhill's knowledge based on the circumstances. Watson argues that the short time between when he purchased the house and when he began noticing the defects means that Larsen-Berryhill must have had knowledge of the issues. Watson admits that the defects "were not observable from a cursory glance or appearance of the property." ECF No. 36 at 6; ECF No. 38 at 5. If the conditions were not readily apparent, then Watson must prove that Larsen-Berryhill in fact saw or experienced issues or conditions that would have provided her with the requisite knowledge.

The Court finds credible Larsen-Berryhill's testimony that she did not observe or experience any issues related to the defects that Watson claims were present at closing. The Court takes Watson's point that "[n]o one would expect a defendant to confess to making a misrepresentation during a trial," ECF No. 38 at 4, but Watson needed to present evidence to contradict Larsen-Berryhill's testimony. He offers only an inference that she must be lying because she lived in the house for six years. The Court will not make such an inference without some evidence to support it.

### C. Watson's Reliance

The evidence at trial suggests that it is possible Larsen-Berryhill may have had knowledge of the water intrusion in the basement. The photos in the Haluska report and the Coleman report indicate that paint was peeling and that there were visible signs of water damage.

Even if Larsen-Berryhill knew about the water issues in the basement, Watson also had knowledge of those issues before he purchased the house. Therefore, to the extent his claims rest on undisclosed defects in the basement, his reliance on Larsen-Berryhill's responses in the RECR was unreasonable and they were not a material inducement to his purchase.

Under Wisconsin law, "when a buyer learns that a misrepresentation has been made prior to closing, the buyer is no longer deceived and, as a matter of law, can no longer rely upon the prior representation." *Lambert v. Hein*, 218 Wis. 2d 712, 732, 582 N.W.2d 84 (Ct. App. 1998). In *Lambert*, the sellers disclosed water issues in the basement due to a missing downspout. *Id.* at 718. During the pre-sale inspection process, the purchasers learned that the water issues were more extensive than the sellers had disclosed in the RECR. *Id.* The purchasers ultimately closed on the transaction but sued for damages related to the sellers' failure to fully disclose the water issues in the basement. *Id.* at 719. The Court of Appeals held that the purchasers had no claim because their reliance on the representations in the RECR regarding the basement was unreasonable. After their discovery of the defect, the purchasers' understanding of the condition of the property included the information they later learned. *Id.* at 720. Their claims for breach of warranty and misrepresentation were therefore barred because their reliance on the sellers' representations in the RECR was unreasonable.

Watson also claims that Larsen-Berryhill is liable under Wis. Stat. § 100.18. The Wisconsin Supreme Court has held that reasonable reliance is not an element of that claim. *Novell v. Migliaccio*, 2008 WI 44 ¶ 49, 309 Wis.2d 132, 749 N.W.2d 544. However, the fact finder "may consider the reasonableness of a person's reliance on a misrepresentation in determining whether there had been a material inducement." *Id.* at ¶ 50. That is, a plaintiff may not be able to prove that the representation materially induced or caused a pecuniary loss if his reliance on the representation was unreasonable. *Id.*

25

Here, Larsen-Berryhill answered "no" to Question B11 regarding her knowledge of water or moisture intrusions or conditions, but she answered "yes" to Question B7, which asked about defects in the basement or foundation. She disclosed that "a little trickle can come down by corner" in heavy rains. When Watson toured the house with Haluska, he discovered that the water issues were more extensive than disclosed in the RECR. He personally noticed "water penetrating the wall and the bricks turning to dust." He said that he "drilled" Haluska regarding the condition of the basement. Haluska responded that it was natural for basements to bleed water during rainy months. Watson did not believe Haluska, and he submitted an amended offer to purchase specifically reserving the right to have the basement further inspected. Watson never obtained another inspection of the basement.

The Court finds that Watson's reliance on Larsen-Berryhill's representations regarding the basement was unreasonable. Watson knew from the answer to Question B7 that there was a water issue in the basement. Watson's own visual inspection revealed that the water issue was more extensive than described in the RECR. Watson did not obtain a professional opinion regarding the issue before the closing, but his understanding of the condition of the basement included his own observations regarding the seriousness of the water issues. Watson's unreasonable reliance also defeats his claim under Wis. Stat. § 100.18 because Larsen-Berryhill's representations regarding the condition of the basement did not materially induce him to buy the house.

To the extent Watson's claims rest on an undisclosed defect in the window in the sunroom, Watson's reliance on Larsen-Berryhill's representations in the RECR was likewise unreasonable. On page 21 of Haluska's report, he noted that the condition of the windows in the sunroom was "marginal." Watson therefore had notice that the condition of the windows in that room was not satisfactory and he could have further inquired as to the condition. Watson chose

not to read Haluska's report before he closed on the purchase, but the disclosures in that report informed his knowledge of the condition of the windows and he could no longer rely solely on Larsen-Berryhill's disclosures in the RECR.

Because Watson's reliance was unreasonable, he cannot prove that Larsen-Berryhill owes him a debt for the defects in the basement or the sunroom window.

## CONCLUSION

In sum, Watson did not prove, as he must, that Larsen-Berryhill owes him a debt under non-bankruptcy law. Therefore, there is no debt to be excepted from discharge under 11 U.S.C. § 523(a)(2)(A). Accordingly,

IT IS HEREBY ORDERED that the plaintiff's claims are denied and this case is dismissed.

# # # # #